1

2

3

4               UNITED STATES DISTRICT COURT

5              NORTHERN DISTRICT OF CALIFORNIA

6

7   DCR WORKFORCE, INC.,                    Case No.  21-cv-06066-EMC

8                  Plaintiff,
                                            **ORDER DENYING PLAINTIFF'S**
9            v.                             **MOTION TO COMPEL OR TO**
                                            **REMAND, AND GRANTING**
10  COUPA SOFTWARE INCORPORATED,            **DEFENDANT'S MOTION TO DISMISS**

11                 Defendant.               Docket Nos. 32, 34

12

13

14          This case arises out of a contract dispute between Plaintiff DCR Workforce, Inc. and

15  Defendant Coupa Software, Inc.  Pending before the Court are Plaintiff's motion to compel filing

16  of documents related to the notice of removal (or, in the alternative, to remand the case to state

17  court), Docket No. 34, and Defendant's motion to dismiss Plaintiff's complaint pursuant to Fed. R.

18  Civ. P. 12(b)(6), Docket No. 32.  For the following reasons, the Court **DENIES** Plaintiff's motion

19  to compel filing of documents or to remand to state court, and **GRANTS** Defendant's motion to

20  dismiss.

21                          I.        **BACKGROUND**

22  A.      Factual Background

23          On July 13, 2018, Plaintiff DCR Workforce, Inc. and Defendant Coupa Software Inc.

24  entered into an Asset Purchase Agreement ("APA") governing the sale, transfer, and assignment

25  of Plaintiff's Vendor Management System ("VMS") Products.  Docket No. 18-1 ("Complaint") ¶

26  11.  The VMS is "an internet-enabled, web-based application that acts as a mechanism for

27  businesses to manage and procure staffing services as well as outside contract or contingent

28  labor."  Complaint ¶ 9.  The APA provided that Plaintiff would receive $25 million dollars in cash

United States District Court
Northern District of California

($3.75 million of which was held back to cover potential indemnification claims, known as the "Holdback Cash," *id.* ¶ 68) and "Contingent Stock Consideration of up to 668,740 shares of Defendant's Common Stock subject to the terms of Schedule 2.13 of the Asset Purchase Agreement." *Id.* ¶ 13.

Pursuant to Schedule 2.13 of the APA, Plaintiff was eligible to earn Contingent Stock Consideration if the VMS Business met three pre-defined revenue targets (defined as the "ARR") covering three eligibility periods. *Id.* ¶ 14.[1]  The contract defines the ARR as follows:

> "**ARR**" means the product of four (4) times the sum (without duplication) of the following amounts, in each case as recognized by Buyer under U.S. GAAP (less any amounts for bad debt, uncollectible amounts, write-offs or other similar amounts) and determined in U.S. dollars during the applicable Measurement Period:
>
> > **(i)** recurring subscription-based revenue for the VMS Products; *plus*
> > **(ii)** revenue generated by customer usage of VMS Products; *plus*
> > **(iii)** revenue for professional services generated by deployment of VMS Products; *plus*
> > **(iv)** revenue for fees received under the License Agreement.
>
> For the avoidance of doubt, if sales of VMS Products are bundled with other product(s) of Buyer, the revenue that relates to the VMS Products will be allocated by Buyer based on the list price of the bundled products (as adjusted for any discount off list price given in connection with any sale).

APA, Schedule 2.13(E).  Plaintiff was entitled to the First Earnout Tranche if the VMS Products generated $8 million in revenue for any consecutive three-month period from Closing through October 31, 2019; it was entitled to the Second Earnout Tranche if the VMS Products generated $10 million in revenue for a Measurement Period that fell between November 1, 2019-February 28, 2021; and it remains eligible to earn the Third Earnout Tranche if the VMS Products generate $16,000,000 in revenue during a Measurement Period that falls between March 1, 2021-December

---

[1] Defendant filed the APA as an exhibit to its motion to dismiss.  Docket No. 32-1, Exh. 1 ("APA"). When ruling on a 12(b)(6) motion, the Court may consider both the allegations in the complaint and any documents "integral to or explicitly relied upon in the complaint."  *Whitehead v. City of Wilmington*, 2011 WL 607386, at *3 (D. Del. Feb. 10, 2011).  Therefore, the Court considers the contents of the agreement at issue in this breach of contract case.

United States District Court
Northern District of California

1    31, 2022. *Id.* ¶¶ 18-20.  The APA language regarding the "Issuance of Contingent Stock

2    Consideration," and, specifically regarding the Second Earnout Tranche at issue here, is as

3    follows:

> The Contingent Stock Consideration that is earned by Seller will be determined as follows: . . . .
>
> **(ii)** If ARR for any Measurement Period that falls entirely within the period beginning on November 1, 2019 and ending on February 28, 2021 (the "**Second Eligibility Period**") equals or exceeds $10,000,000 (the "**Second Milestone**"), then Buyer shall issue to Seller a portion of the Contingent Stock Consideration equal to the quotient obtained by dividing (a) $13,250,000 by (b) the Buyer Closing Stock Price (such shares, the "**Second Earnout Tranche**").  Subject to Section D, if the Second Milestone is not achieved, then Seller shall not earn any portion of the Second Earnout Tranche.

12   APA, Schedule 2.13(B) (emphases in the original).  Schedule 2.13 also defines the procedure by

13   which the parties agreed to resolve disputes regarding calculation of earnout eligibility, providing

14   that: (1) at the close of a milestone period, the management team of the VMS Business would

15   calculate eligibility in a Preliminary Earnout Statement; (2) no more than thirty days thereafter,

16   Defendant would "deliver" to Plaintiff a Final Earnout Statement; (3) within sixty days of receipt,

17   Plaintiff would identify with "reasonable detail" the basis for any "discrepancy in, or disagreement

18   with" the Earnout Statement; and (4) thereafter, an Independent Accounting Firm would review

19   the Earnout Statement and make a "final," "binding," "non-appealable" decision not "not subject

20   to collateral attack for any reason absent manifest error or fraud."  *See* APA, Schedule 2.13(C).

21        In December 2019, Defendant issued the First Earnout Tranche after the VMS Products hit

22   the first revenue target ($8,000,000) for the period from the Closing Date (August 1, 2018)

23   through October 31, 2019.  Complaint ¶ 22.  On or around March 29, 2021, Defendant issued a

24   Final Earnout Statement for the Second Tranche, notifying Plaintiff that the VMS Products had

25   failed to hit the second revenue milestone ($10,000,000) and, as a result, Defendant would not

26   issue the Second Earnout Tranche for the November 1, 2019–February 28, 2021 period.  *Id.* ¶¶ 19,

27   24-25.  Plaintiff alleges that, pursuant to the March 2021 Final Earnout Statement, "the highest

28   ARR computed for the Second Eligibility Period was determined by Defendant to be $9,282,528

3

1    (or just $717,472 below the Second Milestone)." *Id.* ¶ 25.

2        In the operative complaint filed in state court in Florida on May 26, 2021, Plaintiff alleges

3    that Defendant breached multiple provisions of the APA, including: failure to issue the Second

4    Earnout Tranche of Common Stock in violation of § 2.13 of the APA; failure to properly calculate

5    ARR for the second eligibility period in violation of § 2.13 of the APA; failure to operate the

6    Transferred Business and VMS products in an equivalent manner to the manner in which Plaintiff

7    operated in violation of §§ 3.10, 5.4, 5.7, and 6.3 of the APA; failure to perform obligations

8    pursuant to assumed contracts in violation of § 2.3 of the APA; failure to enter into and execute

9    sales agreements for VMS Products in violation of § 11.12 of the APA; and failure to deliver

10   Plaintiff's holdback cash to which it was entitled in violation of § 2.3 of the APA.  Complaint ¶¶

11   32, 38, 50, 60, 65, 74.

12   B.    <u>Procedural Background</u>

13       Plaintiff sued Defendant in the Fifteenth Judicial Circuit in and for Palm Beach County,

14   Florida, raising eight claims, including: Breach of Contract (Count 1); Breach of the Covenant of

15   Good Faith and Fair Dealing (Count 2); Unjust Enrichment (Count 3), Declaratory Relief (Count

16   4), Equitable Accounting (Count 5), Specific Performance (Count 6), Fraud in the Inducement

17   (Count 7), and Negligent Misrepresentation (Count 8). *Id.* ¶¶ 7-157.  Defendant timely removed

18   the action to federal court in the Southern District of Florida.  Docket No. 1.  The U.S. District

19   Court for the Southern District of Florida granted Defendant's motion to transfer the case to this

20   Court pursuant to 28 U.S.C. § 1404(a), on the basis of the forum selection clause in the APA.

21   Docket No. 46; APA § 11.1(a) ("if such Action is initiated by Seller, venue shall lie solely in San

22   Mateo County, California").

23       Currently pending are Plaintiff's motion to compel filing of documents (or, in the

24   alternative, to remand the case to state court) arguing Defendant's Notice of Removal was

25   procedurally deficient pursuant to 27 U.S.C. § 1447(c), Docket No. 34, and Defendant's motion to

26   dismiss the complaint, Docket No. 32.

27                          **II.    <u>JURISDICTION</u>**

28       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

United States District Court  
Northern District of California

United States District Court
Northern District of California

1    Section 1332 imposes two threshold requirements for federal district courts to exercise subject-

2    matter jurisdiction over civil cases removed from state court, pursuant to 28 U.S.C. §§ 1441 and

3    1446.  First, the party seeking removal must establish that the action is between "citizens of

4    different states."  28 U.S.C. § 1332(a)(1).  For actions removed to federal court pursuant to 28

5    U.S.C. § 1441, corporations are considered to be a citizen of their respective state of incorporation,

6    and "the State or foreign state where [the corporation] has its principal place of business."  28

7    U.S.C. § 1332(c)(1).

8        Here, Plaintiff DCR Workforce, Inc. is a Florida corporation with its principal place of

9    business in Florida.  Complaint ¶ 1.  Defendant Coupa is a California corporation with its principal

10    place of business in San Mateo County, California.  *Id.* ¶ 2.  Thus, the parties are completely

11    diverse for purposes of § 1332.  Section 1332 also requires that the amount in controversy in the

12    removed action exceed $75,000.  28 U.S.C. § 1332(a).  Plaintiff raises legal and equitable claims,

13    and seeks damages of at least $72,336,752.  *See* Complaint ¶¶ 75, 94, 107.

14        Because this litigation involves parties of diverse citizenship and the amount in

15    controversy exceeds $75,000, this Court has subject matter jurisdiction over the removed state

16    court action under 28 U.S.C. § 1332.

17              **III.**      <u>**CHOICE OF LAW**</u>

18        In diversity jurisdiction cases, such as this one, the Ninth Circuit has held that the forum

19    state's choice-of-law rules.  *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir.

20    2015).  California courts apply the principles set forth in the Restatement (Second) of Conflict of

21    Laws § 187 to determine the law governing a contract with a choice-of-law provision.  *Nedlloyd*

22    *Lines B.V. v. Superior Court*, 11 Cal.Rptr.2d 330, 333-34 (1992).  Under § 187, the law of the

23    state chosen by the parties applies unless either (1) "the chosen state has no substantial

24    relationship to the parties or the transaction and there is no other reasonable basis for the parties

25    [sic] choice," or (2) the "application of the law of the chosen state would be contrary to a

26    fundamental policy of a state which has a materially greater interest than the chosen state in the

27    determination of the particular issue."  *Id.* at 333 (quoting Restatement (Second) Conflict of Laws

28    § 187(2) (1971)).

1    Here, the parties do not dispute that the APA's choice-of-law provision that Delaware

2  substantive law governs all of Plaintiff's claims because they relate to the validity of the

3  agreement, construction of its terms and/or the rights and duties under the agreement.  *See* APA §

4  11.1 ("[T]he law of the State of Delaware, irrespective of its conflicts of law principles, shall

5  govern the validity of this Agreement, the construction of its terms, and the interpretation and

6  enforcement of the rights and duties of the parties."); Docket No. 32-1 ("MTD") at 4 n.2; *see*

7  *generally* Docket No. 43 ("Opp. to MTD") (citations throughout are to Delaware law).  The

8  parties' contractual choice-of-law provision selecting Delaware law to control the agreement is

9  enforceable under California's choice-of-law rules because Defendant Coupa is incorporated in

10  Delaware, and thus Delaware has a "substantial relationship to the parties."  11 Cal.Rptr.2d at 333.

### IV.    DISCUSSION

12    Because Plaintiff's motion to compel filing of documents (or, in the alternative, to remand

13  to state court), Docket No. 34, involves a question regarding the Court's jurisdiction over this

14  case, the Court addresses it first.  The Court then addresses Defendant's motion to dismiss.

15  Docket No. 32.

16  A.    Plaintiff's Motion to Compel Filing or to Remand to State Court (Docket No. 34)

17    Plaintiff argues that Defendant's Notice of Removal, Docket No. 1, was procedurally

18  deficient because it failed to include "a copy of all process, pleadings, and orders served upon"

19  Defendant in the state court action pursuant to 28 U.S.C. § 1446(a).  Plaintiff initially argued that

20  Defendant's Notice of Removal was deficient because it lacked several documents Defendant was

21  required to file, Mtn. to Compel at 3-9, but concedes in its reply brief that the only alleged

22  deficiency that remains is Defendant's failure to file in federal court the "Earnout Letter dated

23  March 29, 2021" that Plaintiff filed in state court, Docket No. 52 ("Reply re MTC") at 1 n.1.

24  Plaintiff's moves the Court to compel filing of the Earnout Letter pursuant to 28 U.S.C. § 1447(b),

25  or in the alternative, to remand the case to state court pursuant to § 1447(c).  Docket No. 34 ("Mtn.

26  to Compel").

27    1.    There is No Basis to Remand This Case to State Court

28    Because Plaintiff's alternative request that the Court remand this case to state court places

United States District Court
Northern District of California

the Court's jurisdiction over this matter in question, the Court addresses it first.  There is no basis for the Court to remand this case to state court due to Defendant's alleged omission of a single document when filing its notice of removal.  "[T]he majority of federal courts . . . have held that failure to include documents from the state court record under § 1446(a) is a procedural error that does *not* require remand and that can be cured at the federal court, even after expiration of the thirty-day removal period." *Rocha v. Brown & Gould, LLP*, 61 F. Supp. 3d 111, 113 (D.D.C. 2014) (emphasis added); *see id.* at 113 n.3 (citing cases); *see id.* at 1113-14 ("Indeed, among the category of procedural mistakes a defendant potentially could make when removing an action, failing to include certain state court papers usually will qualify as *de minimis* at best.").  The Court agrees with the majority view.  The procedural deficiency Plaintiff alleges, even if true, can be easily cured in federal court.  Moreover, it is not material to the jurisdictional inquiry before the Court.  There is no reason to remand this case to state court on such a technicality.

> 2.    There is No Legal Basis to Compel Defendant to File the Second Earnout Letter

As a threshold matter, it is not clear that Plaintiff is entitled to file a motion to compel Defendant to file documents to cure a deficiency in a notice of removal.  The statutory provision Plaintiff relies upon for this authority, 28 U.S.C. § 1447(b) provides that "[*The district court*] may require the removing party to file with its clerk copies of all records and proceedings in such State court or may cause the same to be brought before it by writ of certiorari issued to such State court" (emphasis added).  By contrast, the following provision, 28 U.S.C. § 1447(c), which provides the basis for Plaintiff's alternative request – to remand this case to state court – expressly provides that a *party* may file "[a] motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)."  Nonetheless, the Court finds no deficiency in Defendant's notice of removal and no legal basis to compel Defendant to file the Second Earnout Letter.

The purpose of 28 U.S.C. § 1446(a)'s requirement that all "process, pleadings, and orders served upon" Defendant in state court are filed with the notice of removal is to ensure that the federal court has a complete record of the state court proceedings.  Here there is no question that the Second Earnout Letter was not part of the state court record.  Plaintiff's complaint, filed in

state court, expressly recognizes that the Second Earnout Letter was not filed in state court because the document was protected by a confidentiality agreement.  Complaint ¶ 24 n.8; *see also* Reply re MTC at 5 (Plaintiff concedes that the Earnout Letter was not attached to the Complaint).  That is the end of the inquiry.  There is no legal basis to compel Defendant to file the Second Earnout Letter in federal court pursuant to § 1446(a) because it was never part of the state court record.  Plaintiff's arguments about whether the Letter was incorporated into the complaint by reference are irrelevant to § 1446(a)'s purpose to ensure a federal court has access to the record of state proceedings.  *Cf. United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (Noting that purpose of the doctrine of incorporation by reference is so that the district court "may assume that [and incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6).").  This Court has such access.

Plaintiff's motion to compel filing or to remand to state court, Docket No. 34, is denied.

B.     Defendant's Motion to Dismiss (Docket No. 32)

Defendant argues Plaintiff's complaint fails to state any claims.  The Court agrees.

1.     Legal Standard: Failure to State a Claim (Rule 12(b)(6))

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).   The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d

990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

### 2.    Count I: Breach of Contract

To state a claim for breach of contract under Delaware law, a Plaintiff must allege "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."  *Sharma v. TriZetto Corp.*, 2016 WL 1238709, at *3 (D. Del. 2016) (citation omitted).  Here, Plaintiff alleges Defendant breached the APA in six different ways.  Complaint ¶¶ 7-75.  Plaintiff fails to allege facts sufficient to state a claim on the basis of any of its six theories.

#### a.    Defendant's Failure to Issue Second Earnout Tranche (Complaint ¶¶ 7-33)

To plead a "facially plausible" claim for breach of an earnout agreement, Plaintiff must allege facts plausibly suggesting "that [it] actually earned and [was] thus entitled to the earnout amount under [the Agreement]."  *See Prospect Pharmacy, LLC v. Walgreen E. Co.*, 2014 WL 3695892, at *4 (D.N.J. July 24, 2014).  Here, for Plaintiff to state a claim for breach based on Defendant's failure to issue the Second Earnout Tranche, it must, first, allege facts showing that it met the $10 million revenue milestone set out in APA, Schedule 2.13(B) to demonstrate it was "entitled to the [Second] [E]arnout [Tranche]."  *Id.*  Plaintiff fails to allege any such facts.

Plaintiff acknowledges that, according to the March 29, 2021 Final Earnout Statement, the highest computed ARR during the Second Eligibility Period was short of the $10 million required for Plaintiff to obtain a contractual entitlement to the Second Earnout Tranche.  Complaint ¶ 25.  Despite this concession, Plaintiff pleads no facts identifying any disagreement with Defendant's calculation in the Final Earnout Statement, nor offering any reason or description of how Defendant erred in its determination that Plaintiff did not qualify for the Second Earnout Tranche.  Instead, Plaintiff alleges on "information and belief" that the VMS Products *must* have hit the $10 million threshold because Defendant's *overall* revenue increased over a partially overlapping time period, and because the market and consumer demand for the VMS products also increased in that

1    time period due to the "unique workforce management conditions caused by the COVID-19

2    pandemic." Complaint ¶¶ 27-29.

3          But absent any *specific* allegations justifying its contentions that (1) the VMS Products in

4    fact brought in more than $10 million in revenue during the Second Eligibility Period and (2)

5    Defendant failed to account for that revenue and credit Plaintiff with the earnout, Plaintiff's

6    pleadings lack any factual basis and amounts to speculation; it "stops short of the line between

7    possibility and plausibility of entitlement to relief." *Eclectic Properties E., LLC v. Marcus &*

8    *Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (citation and quotation marks omitted).

9               b.    <u>Defendant's Failure to Correctly Calculate ARR (Complaint ¶¶ 34-38)</u>

10          Plaintiff's second theory for breach of contract is a conclusory statement that "Defendant

11    has incorrectly calculated the ARR for the Second Eligibility Period pursuant to the Asset

12    Purchase Agreement." Complaint ¶ 35.

13          As a threshold matter, Defendant contends that this claim should be dismissed because

14    Plaintiff did not comply with the dispute procedure required by contract for challenges to the

15    computation of the ARR. MTD at 5 (citing APA, Schedule 2.13(C) (requiring plaintiff to identify

16    with "reasonable detail" the basis for any discrepancy in, or disagreement with" the Earnout

17    Statement and submit any "discrepancy or disagreement" about "the items reflected in a Final

18    Earnout Statement" "for review and final determination by an Independent Accounting Firm")).

19    Plaintiff responds that it did comply with the contractual dispute procedure, appropriately pled that

20    it had satisfied all required conditions precedent, and that *Defendant* failed to comply with the

21    dispute procedure. Opp. to MTD at 19-20 (citing Complaint ¶ 6 ("All conditions precedent to

22    bringing this action have occurred, been performed or been excused.")). Under Delaware law, to

23    demonstrate that contractual conditions precedent have been satisfied at the motion to dismiss

24    stage, "[i]t is enough that the pleading 'allege complete performance generally.'" *In re Cadira*

25    *Grp. Holdings, LLC Litig.*, No. CV 2018-0616-JRS, 2021 WL 2912479, at *14 (Del. Ch. 2021)

26    (citation omitted).

27          Even if Plaintiff has adequately pled compliance with the contract dispute procedure,

28    Plaintiff nonetheless fails to state a claim that Defendant incorrectly calculated the ARR because

United States District Court
Northern District of California

1    Plaintiff does not plead any facts in support of its claim.  This "naked assertions devoid of further

2    factual enhancement" is insufficient to state a claim for breach of contract.  *Iqbal*, 556 U.S. at 678.

3                    c.    Defendant's Failure to Operate Transferred Business in Accordance with

4                          APA (Complaint ¶¶ 39-50)

5            Plaintiff alleges that Defendant breached the APA by "changing the pricing model for the

6    VMS Products" from a "usage-based fee structure" to a "subscription-based model" and by

7    bundling the VMS Products with other Coupa products instead of continuing to sell it as a stand-

8    alone product as Plaintiff had done prior to the sale.  Complaint ¶¶ 42-46.  Plaintiff alleges, on

9    information and belief, that Defendant's "change in the pricing model caused a disruption in

10   revenue derived from the VMS Products" and "substantially limited the revenue" derived from the

11   Products.  Complaint ¶ 46.  Plaintiff alleges the Defendant's change in pricing structure violated

12   APA §§ Article 1 (definition of "Transferred Business"), 3.10, 5.4, 5.7, and 6.3 because Defendant

13   did not operate the business "in a manner substantially equivalent to the manner in which Plaintiff

14   operated or proposed to operate the Transferred Business."  Complaint ¶¶ 39-47, 50.

15           Plaintiff fails to state a claim because it fails to identify any contractual obligation

16   requiring *Defendant* to maintain the pricing structure Plaintiff used prior to the sale.  Each of the

17   APA provisions that Plaintiff cites refer to contractual obligations on *Plaintiff*–the **Seller** under the

18   APA–to operate the business without material change *prior to the close of the transaction* to

19   provide Defendant with the capability to operate the business in continuous manner, or for

20   Defendant to ensure that conditions precedent *required to close the sale* are satisfied.  *See* APA §§

21   Article 1 ("'Transferred Business' means the business of Seller as presently conducted"); 3.10(b)

22   ("the Purchased Assets include all property . . . necessary or required for Buyer to operate the

23   Transferred Business after the Closing in a manner substantially equivalent to the manner in which

24   Seller is currently operating"); 5.4(a) ("Seller shall . . . carry on and preserve the Transferred

25   Business . . . in substantially the same manner as it has prior to the Agreement Date consistent

26   with its past practices."); 5.7 ("Seller shall use commercially reasonable efforts to . . enable Buyer

27   to carry on the Transferred Business immediately after the Closing"); 6.3 ("During the time period

28   from the Agreement Date until the earlier to occur of (a) the Closing or (b) termination of this

United States District Court
Northern District of California

11

1    Agreement in accordance with the provisions of Article 9 [Terms of Termination] . . . . Buyer shall

2    use its commercially reasonable efforts to cause the Asset Purchase . . . to be consummated").

3            Nothing in the APA imposes upon *Defendant* an ongoing obligation after the close of the

4    sale to maintain the pricing structure Plaintiff used prior to the sale.  Indeed, Plaintiff's theory is

5    squarely inconsistent with APA, Schedule 2.13(E), which *expressly* contemplates Defendant's use

6    of subscription-based and bundled sales models, and incorporates sales under such pricing

7    schemes into the agreed-upon method for calculating Plaintiff's eligibility for the Contingent

8    Stock Consideration:

9                    "**ARR**" means the product of four (4) times the sum (without
                     duplication) of the following amounts, in each case as recognized by
10                   Buyer under U.S. GAAP (less any amounts for bad debt,
                     uncollectible amounts, write-offs or other similar amounts) and
11                   determined in U.S. dollars during the applicable Measurement
                     Period:
12
13                           **(i) recurring subscription-based revenue for the VMS
                             Products**; *plus*
14                           **(ii)** revenue generated by customer usage of VMS Products;
                             *plus*
15                           **(iii)** revenue for professional services generated by
                             deployment of VMS Products; *plus*
16                           **(iv)** revenue for fees received under the License Agreement.

17                   For the avoidance of doubt, **if sales of VMS Products are bundled
                     with other product(s) of Buyer, the revenue that relates to the
18                   VMS Products will be allocated by Buyer based on the list price
                     of the bundled products** (as adjusted for any discount off list price
                     given in connection with any sale).
19

20   *Id.* (emphases added).  Plaintiff fails to state a claim for breach of contract based on Defendant's

21   use of different pricing models.  *Sharma v. TriZetto Corp.*, 2016 WL 1238709, at *3.

22                   d.      Defendant's Failure to Assume Contracts (Complaint ¶¶ 51-61)

23           Plaintiff alleges Defendant breached its obligation to "be responsible and liable for all

24   terms, conditions, provision, obligations, covenants and agreements of [Plaintiff]" with regards to

25   the contracts that were assigned to and assumed by Defendant pursuant to the APA.  Complaint ¶

26   54.  Plaintiff alleges, "on information and belief," that Defendant failed to uphold its obligations

27   under the contracts it assumed by "requiring the third-party customers of the VMS Products under

28   the Assumed Contracts to change the fee structure to a subscription-based model" from the usage-

United States District Court
Northern District of California

based model that Plaintiff previously implemented. *Id.* ¶ 56. Plaintiff alleges "on information and belief" that Defendant both required third-party customers to change the fee structure in the existing contracts it assumed *and* Defendant changed the pricing model term of unexecuted contracts that Defendant was required to enforce. *Id.* ¶¶ 56-58.

Plaintiff's allegation of breach of contract on this theory stem from its identification of Defendant's contractual obligation to be responsible "for all the terms" of seventeen executed contracts and three unexecuted contracts it assumed. APA, Exh. G ("Assignment and Assumption Agreement") §§ 2; Schedule 2.1(d) (listing executed and unexecuted contracts Defendant assumed). However, Plaintiff fails to plead facts sufficient to allege a breach of that obligation by the Defendant, and resulting damage to the Plaintiff. *Sharma v. TriZetto Corp.*, 2016 WL 1238709, at *3.

First, Plaintiff pleads no factual predicates justifying its assertion that Defendant breached its obligation to assume the contracts listed in the APA by "requiring" third-party customers to use a subscription-based fee structure. Plaintiff's allegations are based on "information and belief." Complaint ¶¶ 56-58. "Pleading based upon information and belief is permitted under Rule 9(b) when 'essential information lies uniquely within another party's control;' however, the pleading must still 'set[ ] forth the specific facts upon which the belief is reasonably based.'" *Brinkmeier v. Graco Children's Prod. Inc.*, 767 F. Supp. 2d 488, 496 (D. Del. 2011) (quoting *Exergen Corp. v. Wal–Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009)). Plaintiff's bare assertion that Defendant *breached* those contracts with third-party customers does not flow from "any specific facts," nor does Plaintiff offer a reasonable basis for this Court to credit its belief. *Id.* There are no allegations that third-party customers assert any such breach by Defendant. Nor is there any allegation as to the specific terms of such contracts that precluded Defendant from utilizing a subscription-based model.

Finally, Plaintiff also fails to plead "specific facts upon which" a reasonable belief may be based that Defendant's conduct *damaged* Plaintiff. Plaintiff attempts to connect this theory of breach to its harm by asserting that "but for Defendant's failure to perform its obligations pursuant to the Assumed Contracts, Defendant would have achieved an ARR of at least $10,000,000 during

13

the Second Eligibility Period, triggering Defendant's contractual obligation to issue" the Second

Earnout Tranche.  Complaint ¶ 60.  But Plaintiff does not explain how Defendant's alleged breach

by changing the terms of the pricing model to some or all of the twenty assumed contracts

precluded Plaintiff from earning the Second Earnout Tranche sufficient to "raise [Plaintiff's] right

to relief above the speculative level." *Twombly*, 550 U.S. at 545.

> e.      Failure to Provide Further Cooperation (Complaint ¶¶ 62-66)

Plaintiff alleges that Defendant breached APA § 11.12 by failing to "cooperate" to pursue

sales leads identified by Plaintiff.  Complaint ¶¶ 62-67. Plaintiff's claim fails, however, because

the APA section it cites does not impose upon Defendant an obligation to "cooperate" to generate

business following the closing of the transaction in any particular way.

APA § 11.12, part of Article 11 titled "Miscellaneous," reads:

> Further Assurances. Prior to and following the Closing, each party
> agrees to cooperate fully with the other parties and to execute such
> further instruments, documents and agreements and to give such
> further written assurances as may be reasonably requested by any
> other party to evidence and reflect the transactions described herein
> and contemplated hereby and to carry into effect the intents and
> purposes of this Agreement.

Under Delaware law, courts must first determine whether the contractual language in

question is ambiguous.  *True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 38 (Del. Ch. 1997)

(citation omitted).  "If the contract's terms are clear on their face . . . . the Court must apply the

meaning that would be ascribed to the language by a reasonable third party." *Id.* (citation

omitted).  Here, the plain language of APA § 11.12 is clear: it is a general "further assurances"

clause obliging the parties to work together to carry the transaction reflected in the APA to

completion.  *See id.* at 39 (characterizing further assurances clauses as "catchall contract

provision[s] by which a party, after making a precise commitment to perform in some manner,

makes a vague, more general commitment to take other actions that are incidental to, and

necessary for, the performance of the core commitment").

Whatever room there may be to interpret the scope of the further assurances clause here, it

does *not* imply the specific obligation upon Defendant to pursue sales leads in a manner that

Plaintiff advocates.  Indeed, Plaintiff's reading directly conflicts with the APA provision that

14

actually lays out the terms of the parties' cooperation regarding sales.  The APA includes a separate section specifically defining the scope of the parties' obligations to generate or maintain business–which confers a clear obligation on Plaintiff to cooperate in generating business at the request of Defendant, but confers no such reciprocal obligation on Defendant.  *See* APA § 5.4(a) ("Seller [Plaintiff] shall . . . carry on and preserve the Transferred Business and its relationships with customers, advertisers, licensors . . . in substantially the same manner as it has prior to the Agreement Date consistent with its past practices.  *If so requested by Buyer* [Defendant], Seller [Plaintiff] shall exercise commercially reasonable efforts to cooperate with Buyer in facilitating an orderly and smooth transition of relationships to Buyer upon the Asset Purchase. . . . Such cooperation may include joint customer calls and cooperation in setting sales, marketing, and manufacturing strategies.") (emphasis added).

Thus, Plaintiff's reliance on APA § 11.12 to confer upon Defendant a duty to pursue sales leads that Plaintiff identified is misguided.  Plaintiff fails to articulate a contractual obligation that Defendant was required to uphold to state a claim for breach on this theory.

f.   Failure to Pay Holdback Cash (Complaint ¶¶ 68-75)

Plaintiff alleges that Defendant APA § 2.3 by failing to return "the entire Holdback Cash Amount" (the portion of the cash consideration that was withheld at closing as partial security for indemnification obligations) by August 1, 2020.  Complaint ¶¶ 68-75.

Plaintiff, however, fails to plead facts demonstrating its entitlement to the Holdback Cash Amount or demonstrating Defendant's alleged breach.  Instead, Plaintiff alleges on "[o]n information and belief" that it had "satisfied all of its obligations pursuant to the [Agreement]." Complaint ¶ 71.  Whether Plaintiff satisfied its obligations to entitle it to return of the Holdback Cash (and how much of the entitlement Plaintiff had not received) would be a matter within Plaintiff's own knowledge.  Therefore, Plaintiff cannot rely on "information and belief" allegations because it does not explain why this information would be uniquely within Defendant's control.  *Brinkmeier*, 767 F. Supp. 2d at 496.  Plaintiff alleges no further facts or basis for its claim of Defendant's breach.  Thus, Plaintiff fails to state a claim on this theory.

1        3.       <u>Count II: Breach of Implied Covenant (Complaint ¶¶ 76-94)</u>

2        Plaintiff's second count is that Defendant breached the implied covenant of good faith and

3 fair dealing by failing to adhere to Plaintiff's usage-based pricing model in its sale of VMS

4 Products and by failing to pursue sale leads that Plaintiff suggested.  Complaint ¶ 90.

5        To state a claim under the implied covenant of good faith and fair dealing, Plaintiff must

6 allege "a specific obligation implied in the contract, a breach of that obligation, and resulting

7 damages."  *Fortis Advisors LLC v. Dialog Semiconductor PLC*, C.A. No. 9522-CB, 2015 WL

8 401371, *3 (Del. Ch. Jan. 30, 2015) (unpublished); *see also Nemec v. Shrader*, 991 A.2d 1120,

9 1125-26 n.18 (Del. 2010) (citing cases (implied covenant cannot be used to circumvent the parties

10 bargain ….").  "The implied covenant only applies where a contract lacks specific language

11 governing an issue and the obligation the court is asked to imply advances, and does not

12 contradict, the purposes reflected in the express language of the contract."  *Fortis*, 2015 WL

13 401371 at *3.  "[O]ne generally cannot base a claim for breach of the implied covenant on conduct

14 authorized by the agreement."  *Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (Del. 2010) (alteration

15 in the original and footnote omitted).

16        Plaintiff fails to state a claim on this theory for three reasons.  First, the APA includes

17 "specific language governing" the issue of whether Defendant had an obligation to sell the VMS

18 Products using Plaintiff's pricing model and whether Defendant was obliged to pursue Plaintiff's

19 suggest sales leads.  *Id.*  Second, the implied obligation Plaintiff alleges – Defendant's ongoing,

20 post-Closing obligation to sell the VMS Products using the same pricing model that Plaintiff

21 previously used and to pursue all of Plaintiff's suggest sales leads, contradicts the "purposes

22 reflected in the express language of the contract."  *Id.*  And third, Plaintiff's baseless speculation

23 that Defendant crafted a long-term conspiracy to change its pricing structure and damage its own

24 revenues in order to *just barely* avoid hitting the Second Earnout Milestone, *see* Complaint ¶ 25,

25 and deny Plaintiff the Second Earnout strains credulity.

26        Indeed, Plaintiff concedes that Defendant was under no contractual obligation under the

27 APA to operate the VMS Products business in any particular way.  *See* Complaint ¶¶ 80

28 ("Pursuant to Section 2.1 of the Asset Purchase Agreement, Defendant acquired Plaintiff's right,

United States District Court
Northern District of California

United States District Court
Northern District of California

title and interest to the Purchased Assets free and clear of all Encumbrances.  Accordingly, pursuant to the terms of the Asset Purchase Agreement, upon the Closing of the acquisition, Defendant was able to use and operate the Purchased Assets in its discretion."); 87 ("the terms and Conditions of Contingent Stock Consideration did not include an express standard for Defendant's discretion in owning and operating the Purchased Assets").  Directly contrary to Plaintiff's allegation of an "implied" obligation that Defendant sell in conformity with Plaintiff's past practices, the APA expressly contemplated (1) that Defendant would sell VMS Products using subscription-based and bundled sales models, *see* APA, Schedule 2.13(E); (2) that "no covenant . . . restricts . . . the prices which [Defendant] may charge for its products, technology or services," *see* APA § 3.13(b); and (3) that "[t]he express terms hereof [in the APA] control and supersede any course of performance or usage of the trade inconsistent with the terms hereof," *see* APA § 11.6.  Moreover, as explained above, the APA expressly obligated *Plaintiff* to cooperate with Defendant, at Defendant's request, to pursue marketing opportunities, but exempt on Defendant from any reciprocal obligation.

Thus, Plaintiff fails to state a claim of breach of the implied covenant of fair dealing because it alleges an *implied* obligation already "authorized by the agreement."  *Nemec*, *supra*. Indeed, the alleged implied obligation *contradicts* "the purposes reflected in the express language of the contract."  *Fortis*, 2015 WL 401371 at *3.

4.   Count VII: Fraud in the Inducement (Complaint ¶¶ 131-144)

Plaintiff alleges Defendant committed fraud in the inducement by alleging that Defendant induced Plaintiff to enter into the APA because during negotiations, Defendant's corporate officers promised they would continue to offer the VMS Products as a "standalone" product on a "transactional/usage based spend billing model," Complaint ¶¶ 133, 135, and "would provide" Defendant's "full support on sales, pricing and contracting with customers" to ensure that "the earnout tranches are achieved," *id.* ¶¶ 132, 136.  *See also id.* ¶ 134 (alleging Defendant agreed it "would have one hundred and twenty (120) sales people" selling the VMS Products).

To plead a claim for Fraud in the Inducement, Plaintiff must allege specific facts demonstrating that: (1) Defendant made a false statement; (2) with the knowledge or belief that the

1    representation was false or with reckless indifference to the truth; (3) with an intent to induce

2    Plaintiff to act or refrain from acting; (4) Plaintiff reasonably relied on the representation; and (5)

3    Plaintiff was damaged as a result.  *Microstrategy, Inc. v. Acacia Research Group,* 2010 WL

4    5550455 at *12 (Del. Ch. Dec. 30, 2012) (internal citations omitted); Fed. R. Civ. P. 9(b) ("in all

5    averments of fraud the circumstances constituting fraud … be stated with particularity").

6            Here, it is doubtful whether Plaintiff's allegations sufficiently plead falsity and intent by

7    Defendant's corporate officers.  The statements Plaintiff cites in its complaint are likely

8    unactionable because in fact Defendant took steps to ensure that Plaintiff obtained the First

9    Earnout Tranche, tending to suggest that Defendant *intended* to perform those future promises, at

10   least *at the time the promises were made* (and for some period of time afterwards).  *See Winner*

11   *Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063 at *7 (Del. Ch. 2008) ("An

12   unfulfilled promise of future performance will not convert a potential contract claim into a claim

13   sounding in fraud, *unless at the time the promise was made the speaker had no intention of*

14   *performing*.") (emphasis added); *id.* at *9 ("This Court looks with particular disfavor at allegations

15   of fraud when the underlying utterances take the form of unfulfilled promises of future

16   performance. . . . [T]he ultimate question turns on whether the speaker intended not to perform

17   when she made the promise, which is generally difficult to prove or disprove because there may be

18   no readily observable, objective, external fact with which to divine the speaker's intent.").

19           But assuming Plaintiff sufficiently pled the falsity and intent elements, it is clear that

20   Plaintiff fails to sufficiently plead its "reasonable reliance" on the alleged representations that

21   Defendant would maintain the VMS Products exclusively as a "standalone" product with a "usage

22   based spend billing model," Complaint ¶¶ 133, 135, because "[i]t is unreasonable [for Plaintiff] to

23   rely on oral representations when they are expressly contradicted by the parties' written

24   agreement."  *Flores v. Strauss Water, Ltd*., 2016 WL 5243950 at *7 (Del. Ch. 2016) (citation

25   omitted).  Here, as discussed above, the APA specifies that the VMS Products would be sold on a

26   "subscription" and "bundled" basis, Defendant was not restricted in the price or manner in which

27   it may sell the VMS Products, and that the parties would cooperate on sales *only* if requested by

28   Defendant.  Thus, Plaintiff fails to state a claim for Fraud in the Inducement.

United States District Court
Northern District of California

5.      Equitable Claims (Counts III-VI, VIII)

Plaintiff pleads five Equitable Claims, for Unjust Enrichment (Count III), Declaratory Relief (Count IV)[2], Equitable Accounting (Count V), Specific Performance (Count VI), and Negligent Misrepresentation (Count VII).  Defendant contends that Plaintiff's equitable claims should all be dismissed because Plaintiff fails to make a threshold pleading that it has an inadequate remedy at law.  MTD at 13.  Defendant cites the Delaware Chancery Court's decision dismissing equitable claims for want of jurisdiction based on the existence of adequate remedy at law in *International Business Machines Corp. v. Comdisco, Inc.*, 602 A.2d 74, 85 (Del. Ch. 1991). Plaintiff offers no response to Defendant's argument.

Indeed, Plaintiff's complaint does not allege that a legal remedy would be inadequate with respect to the Unjust Enrichment, Declaratory Relief, and Negligent Misrepresentation claims (in fact, Plaintiff *seeks* a legal remedy in connection with the latter claim).  *See* Complaint ¶¶ 98-107 (unjust enrichment); ¶¶ 107-114 (declaratory relief); ¶¶ 145-157 (negligent misrepresentation). Although Plaintiff does allege that it has "no adequate remedy at law" in connection with its Specific Performance claim, the remedies Plaintiff seeks (stock issuance of set value from a public company and the return of Holdback Cash) are both compensable at law.  *See Lineberger v. Welsh*, 290 A.2d 847, 848-49 (Del. Ch. 1972) (finding specific performance was inappropriate for contract involving shares of stock).

---

[2] "A declaratory judgment is a creature of statute and not a purely equitable remedy."  *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 985 (Del. Ch. 2016).  "Whether a declaratory judgment is legal or equitable in nature depends on the underlying subject matter."  *Id.*  Some courts look "at the accompanying requested relief or the essence of the declaration being sought."  *Id.*  Here, Plaintiff seeks multiple declaratory judgments.  First, that "Plaintiff is entitled to the Second Earnout Tranche."  Complaint ¶ 114.  The theory underlying this request is identical to Plaintiff's breach of contract claim seeking damages equal to the Second Earnout Tranche, and thus fails for the same reasons that claim did.  Plaintiff's remaining requests for relief – declarations stating that "Defendant has not provided the necessary documentation in order for Plaintiff to fully dispute Defendant's ARR calculation," that the "dispute resolution procedures" may not be used until Plaintiff received necessary documentation, and "further relief as this Court deems just, proper and equitable"—all sound in equity (*i.e.*, to compel productions, to enjoin action, and other equitable remedies).  Thus, to obtain the declaratory judgments Plaintiff seeks, Plaintiff must plead facts sufficient to show an entitlement to equitable relief.  Plaintiff fails to do so, as it provides no factual basis for its allegation that Defendant failed to provide documentation to which Plaintiff is entitled, does not describe what documents it seeks, nor does Plaintiff explain what information it is lacking.

United States District Court
Northern District of California

1     Plaintiff alleges in support of the Equitable Accounting claim only that "it is not clear that

2  the remedy at law is as full, adequate and expeditious as it is in equity," *id*. ¶ 116, but this is the

3  sort of hypothetical and conclusory pleading is insufficient under *Twombly*.  Moreover, Plaintiff's

4  theory justifying the need for an equitable accounting is that a proper ARR calculation to assess

5  Plaintiff's entitlement to the Second Earnout Tranche would "involve extensive and complicated

6  accounts requiring an equitable accounting," Complaint ¶ 119, but Plaintiff fails to explain what

7  information Defendant fails to provide, particularly when Defendant and Plaintiff had no trouble

8  in accounting when determining that Plaintiff was eligible for the First Earnout Tranche.

9     Thus, Plaintiff fails to adequately plead facts sufficient to show it lacks an adequate

10  remedy at law to state its equitable claims and specifically why it is entitled to injunctive relief.

11     6.     Leave to Amend Would be Futile

12     In summary, each of Plaintiff's claims rely on bare conclusory assertions lacking well-

13  pleaded facts sufficient to state claims.  Therefore, Defendant's motion to dismiss the complaint,

14  Docket No. 32, is granted.  Further, "a district court may dismiss without leave [to amend]

15  where...amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d

16  1034, 1041 (9th Cir. 2011).  Here, because the express provisions of the APA contradict and

17  preclude each of Plaintiff's claims, any attempt to amend the complaint would be futile.  Plaintiff

18  does not allege an independent cause of action for its entitlement to documents related to the

19  calculation of the ARR or its assertion that Defendant improperly withheld any documents.  The

20  only portion of the complaint where Plaintiff references such documents is in its request for

21  declaratory judgment.  Complaint ¶¶ 113-14.  Under Delaware law, a request for declaratory

22  judgment, among other requirements, must stem from "an actual controversy . . . involving the

23  rights or other legal relations of the party seeking declaratory relief." *Rollins Int'l, Inc. v. Int'l

24  Hydronics Corp.*, 303 A.2d 660, 662 (Del. 1973) (citation omitted).  Plaintiff states that its request

25  for declaratory judgment is premised on the "actual controversy with respect to the Contingent

26  Stock Consideration due pursuant to the Asset Purchase Agreement."  Complaint ¶ 111.

27  Plaintiff's request for declaratory judgment, then, is derivative of its other causes of action relating

28  to the Second Earnout Tranche.  However, as explained above, Plaintiff fails to state any claims

demonstrating an "actual controversy" on this ground, and it would be futile for Plaintiff amend those claims brought in this case.  Therefore, there is no basis for the "actual controversy" underlying Plaintiff's derivative request for declaratory judgment herein.  Plaintiff does not plead an independent controversy to sustain its requests for declaratory judgment in this action.  No additional controversies are encompassed in this complaint.  Therefore, for the same reasons Plaintiff cannot cure its underlying claims related to the Second Earnout Tranche, it cannot cure its derivative request for declaratory judgment in this action.  Plaintiff will not be granted leave to amend its claims.  The Court does not pass judgment on whether the Plaintiff may bring a different suit seeking documents necessary to employ the dispute resolution process set forth in the APA.

## V.    CONCLUSION

The foregoing reasons, (1) Plaintiff's motion to compel filing, Docket No. 34, is **DENIED**; (2) Defendant's motion to dismiss, Docket No. 32, is **GRANTED**; and (3) because amendment would be futile, dismissal is without leave to amend.

This order disposes of Docket Nos. 32 and 34.  The Clerk shall enter Judgment and close the file.

**IT IS SO ORDERED**.

Dated: October 13, 2021

_____
EDWARD M. CHEN
United States District Judge